BRIAN KNAUS et al., Plaintiffs-Appellees, v. CHARLES C. GUIDRY, Indiv. and as Agent of Charles C. Guidry, P.C., et al., Defendants-Appellants (Douglas Erickson et al., Defendants).

First District (6th Division)    No. 1—07—3509

Opinion filed March 27, 2009.

Robert Marc Chemers and Scott L. Howie, both of Pretzel & Stouffer, Chtrd., of Chicago, for appellants.

John J. Curry, Jr., Jeremy S. Unruh, and Amanda J. Kimble, all of Polsinelli Shalton Flanigan Suelthaus, P.C., of Chicago, for appellees.

JUSTICE JOSEPH GORDON delivered the opinion of the court:
Defendants appeal from an order of the circuit court denying their motion to dismiss for lack of personal jurisdiction. For the reasons that follow, we reverse.

## I. BACKGROUND

In this action, plaintiffs Brian Knaus and Aaron Everson, residents of Florida and Missouri, respectively, contend they were defrauded by the captioned defendants Douglas Erickson, Robert Anderson, Bruce Edwards, the Richum Group, Jerome Carter, PHD Management, L.L.C., Wesley Taylor, the Taylor Group Corporation, Charles C. Guidry, and Charles C. Guidry, P.C., in what they describe as an "advance fee scheme." According to plaintiffs' complaint, the first part of the fraud was perpetrated by the Richum Group, a company that was previously incorporated in Wyoming, but whose registration has now lapsed. Plaintiffs contend that the Richum Group is currently operated by its president, Robert Anderson, a resident of Illinois, its vice-president, Douglas Erickson, a resident of Missouri, and an agent of the corporation named Bruce Edwards, a resident of Illinois. They assert that Edwards, on behalf of the Richum Group, induced them to give the company $390,000 by representing that the money would be used to secure a loan for the Richum Group and that as soon as the loan was secured, they would receive $780,000 in return—in effect doubling their money for the temporary use of the funds. If a loan was not secured, the money, which they advanced, would be returned to them. Plaintiffs thereupon advanced the sum of $390,000, of which

Knaus contributed $300,000 and Everson the remaining $90,000. The plaintiffs aver that these funds were placed in an escrow account in Chicago and none of these funds or proceeds therefrom was ever returned to plaintiffs.

According to plaintiffs' complaint, the Richum Group never intended to return any of the money, but instead conspired with other defendants to convert the money for their own use and benefit. Pursuant to this scheme, they allege that the vice-president of the Richum Group, Erickson, ordered the escrow agent, an Illinois attorney named Robert Riffner, to disburse $40,000 of plaintiffs' money to Erickson, Anderson and others. Erickson then arranged the transfer of the balance of the funds to another entity called PHD Management Group, L.L.C., a Florida limited liability company operated by its finance director, Jerome Carter, who was a resident of Texas. Plaintiffs contend that the remaining $350,000 was placed in a PHD escrow account located in Houston, Texas, and administered by the appellants in this matter, Charles C. Guidry and his law firm, Charles C. Guidry, P.C. (hereinafter Guidry defendants). Plaintiffs allege that Guidry distributed $338,000 to Carter and transmitted $12,000 to an Illinois entity called the Taylor Group Corporation, which was operated by its president, Wesley Taylor, who was a resident of Illinois.

In their complaint, plaintiffs Knaus and Everson specifically allege that the fraud began when Edwards, acting as an agent of the Richum Group, induced them to individually enter into separate agreements entitled "Assignment of Escrow Funds" on December 8, 2003. Under the terms of these contracts, Knaus and Everson agreed to place $300,000 and $90,000 respectively in an escrow account administrated by attorney Robert Riffner on behalf of the Richum Group. According to plaintiffs, the money was to be used "as a bond against which the Richum Defendants would secure a loan." Under the agreements, if a loan was secured, the Richum Group would, within two business days thereafter, deposit into the escrow account funds equal to the amount plaintiffs had deposited into the account and direct the escrow agent, Riffner, to remit to each plaintiff an amount twice as large as the amount he had invested. The agreements also provided that in the event the Richum Group failed to secure a loan, all of plaintiffs' funds would be returned to them. Each agreement was executed by the individual plaintiffs, Edwards, and the Richum Group's vice-president, Erickson.

Plaintiffs aver that their $390,000 was placed into a Richum Group escrow account in Chicago pursuant to the agreements, but that they never received any money from defendants. According to bank deposit slips attached to the complaint, Everson's $90,000 cashier's check was

deposited into the escrow account on December 12, 2003, and Knaus's $300,000 check was deposited on December 16, 2003. The complaint is also accompanied by a copy of Knaus's $300,000 cashier's check and a withdrawal slip drafted at Associated Bank and dated December 12, 2003, which states: "w/d from Sav per phone conversation / To: Riffner Barber Scott Law firm / Re: Richum Group, Escrow Account" and is directed to "Brian Knaus 813 English Ln Belleville, Il 62223." Plaintiffs allege that Erickson, with the knowledge and consent of Anderson, directed Riffner to distribute portions of the escrow funds to himself, Anderson and others on dates spanning from December 15, 2003, to December 31, 2003. A letter drafted by Riffner and various bank documents attached to the complaint show that Erickson received $4,600, Anderson received $22,155, Riffner's firm received $1,500, and three other entities, not described in the record, received $11,745.

Plaintiffs allege that the balance of the escrow account, $350,000 was transferred by Erickson on behalf of the Richum Group to a Texas company called PHD Management Group, L.L.C., pursuant to a contract between the companies. They contend that, unbeknownst to them, Erickson, on behalf of Richum and with the knowledge of Anderson, entered into a "Contract/Loan Agreement" with Jerome Carter, the finance director and principal of PHD and Texas resident, on December 16, 2003. Under the terms of that agreement, PHD was to place a "Capital Indemnity Bond" with a face value of $300 million with a lender, which would, in turn, give the Richum Group a loan in the amount of $210 million against the bond. Of this amount, the Richum Group was to receive $10 million in cash and a line of credit in the amount of $190 million to fund a series of building projects. The remaining $10 million would be used by PHD to cover the cost of the bond. Under the contract, the Richum Group was obligated to repay the loan within one year and PHD was entitled to 40% of the Richum Group's net profits from the enumerated building projects. Also on December 16, 2003, the Richum Group and PHD entered into an accompanying "Escrow Account Agreement," which provided that the Richum Group would place $350,000 into a PHD escrow account located at a Wells Fargo Bank branch in Houston, Texas, and managed by appellant Charles C. Guidry, P.C., to be used by PHD in securing the "Capital Indemnity Bond" which would be used as collateral to secure the loan.[1] The Escrow Account Agreement was executed by Erickson, Carter, and Guidry.

---

[1] The record does not explain the exact financial process by which the plaintiffs' $390,000 investment would be transformed into a $210 million loan

According to the complaint, Carter, Guidry, and another defendant, named Wesley Taylor, who is a resident of Illinois, falsely represented to the Richum Group that it had received a loan with which to transact business, but in fact, converted the plaintiffs' $350,000 for their own benefit. Plaintiffs allege that defendants Erickson, Anderson, Guidry, Carter, and Taylor never intended to return the $390,000 to them, but instead divided the funds amongst themselves.

In count I of the complaint, plaintiffs advance a claim for fraud. They specifically contend that Anderson, Erickson, and Edwards (the Richum defendants) misrepresented to plaintiffs that the funds they deposited into the Illinois escrow account would not be transferred out of that account and would be used only as a bond to secure a loan, that they would be paid a premium if such a loan was secured, that their money would be returned if the loan was not received, and that they were dealing in good faith with third parties, "such as Defendants Guidry, Taylor, and Carter." Plaintiffs alleged that these intentional false representations induced them to give the Richum defendants $390,000, which the defendants never intended to return. They further alleged:

"Upon information and belief, Defendants Carter, Guidry, and Taylor defrauded Plaintiffs when they induced the principals and agents of the Richum Group to pay over Plaintiff's funds from the Richum Group escrow account to the escrow account controlled by PHD Management, LLC, Charles C. Gudry, P.C., and Taylor. In the alternative, upon information and belief, Defendants Edwards, Erickson, Anderson, Guidry, Carter, and Taylor fraudulently induced Erickson and Anderson to pay over the funds while in fact all of said Defendants had actually agreed to split up the funds among themselves."

Plaintiffs next assert that Carter and Taylor, on behalf of PHD, misrepresented to the Richum Group that they secured a loan on the Richum Group's behalf. Plaintiffs allege that these false statements induced the Richum defendants to remit $350,000 to PHD.

In count II, plaintiffs allege that defendants' actions violated the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2002)). They contend that the Richum defendants violated the Act by not disclosing that they would have exclusive control over the Illinois escrow account and by falsely stating that they would use the money to secure a loan. Plaintiffs assert that Carter, Guidry, and Taylor misrepresented facts regarding their use of the funds in securing a fictitious Capital Indemnity Bond.

---

for the benefit of the Richum Group and that process is not substantially relevant to the legal analysis in this case.

In count III, which plaintiffs label "Conspiracy to Defraud," they allege that all of the defendants entered into a conspiracy to defraud plaintiffs of their money. They contend that the Richum defendants, with the knowledge and consent of the other defendants, entered into the escrow fund agreements with plaintiffs to induce them to transfer their money to an escrow account, which the defendants divided amongst themselves.

In count IV, plaintiffs alleged that when the Richum defendants entered into the assignment of escrow funds agreements with them, they assumed fiduciary duties to exercise the utmost care in handling the funds, but breached that duty by failing to exercise due diligence in entering into the agreement with PHD. They further assert that "Carter, Guidry, and Taylor each breached their fiduciary duty to Plaintiff[s] by failing to properly exercise reasonable skill and care in handling Plaintiffs' funds."

In count V, plaintiffs allege that defendants converted the $390,000 by inducing them to deliver the money into the Illinois escrow account and failed to return the money. In count VI, they aver that defendants committed breach of contract by failing to return to them their $390,000 deposit and by failing to give them an additional $390,000 as required under the contract.

In count VII, plaintiffs allege that the "advance fee scheme" perpetrated by defendants constituted "constructive fraud" because it had, and continues to have, "a detrimental effect on the public interest and on both public and private confidence."

On January 24, 2007, defendant Charles Guidry filed a motion to dismiss the plaintiffs' claims against him and his law firm for lack of personal jurisdiction and a memorandum in support of that motion. Guidry attached an affidavit to his motion in which he averred that his firm had no contacts with the state of Illinois, that he was not an officer of PHD, and that its relationship with PHD was limited to an attorney-client relationship. He also claimed that he did not draft or participate in the drafting of the "Contract/Loan Agreement" between PHD and the Richum Group.

Guidry subsequently filed an amended motion to dismiss the complaint against him and his law firm on the basis of a lack of personal jurisdiction, again arguing that he had insufficient contacts with Illinois to be subject to the jurisdiction of this state. In support of this motion, Guidry attached two affidavits—one on behalf of his law firm and one on behalf of himself—in which he averred that he and his law firm had "no connection with the Richum Group," were not signatories to the assignment of escrow funds agreements between plaintiffs and the Richum Group, and were not "involved in or con-

nected to" the transactions in which plaintiffs transferred money to the Richum Group. Guidry then denied performing any of the activities listed in Illinois's long-arm statute, section 2—209(a) of the Code of Civil Procedure (735 ILCS 5/2—209(a) (West 2006)), which may give rise to personal jurisdiction in this state.

On October 23, 2007, plaintiffs filed a response to Guidry's motion, arguing that Guidry and his firm were subject to the jurisdiction of Illinois because Guidry individually committed a tortious act in this state and transacted business here, namely, by arranging with Illinois parties to have the plaintiff's money transferred to a Texas escrow account under his control, which he then dispersed to other defendants, including defendant Wesley Taylor in Illinois. In making this claim, plaintiffs attempted to show that Guidry was not a mere escrow agent for PHD, but instead was a manager of the company that negotiated the transfer of the plaintiffs' funds from Illinois to Texas. In support of this proposition, they attached a copy of a certificate of amendment to the PHD articles of organization evidently filed with the Florida Secretary of State in which Guidry purported to list himself as a treasurer, secretary, and manager of the company. The certificate, they noted, is dated December 15, 2003, the day before the Richum Group and PHD entered into the "Contract/Loan Agreement" which served as the basis of the transfer of plaintiffs' funds from Illinois to Texas. The plaintiffs also attached a letter written by the Florida Secretary of State's office in response, stating that his request was not formatted correctly and that he would need to submit a new filing indicating whether the "FOUR people involved with this company are MANAGERS or MANAGING MEMBERS." In reply, Guidry submitted a filing in which he listed four officers, Carter, Guidry, and two other individuals, named Clinton Hall and Luis Vazquez, all of whom are identified as managers. Plaintiffs also attached to their response a copy of the affidavit Guidry attached to his original motion to dismiss.

In support of their claim that Guidry sent money back to Taylor, plaintiffs attached a letter drafted by Guidry to an investigator with the State Bar of Texas in which he admitted that he sent $12,000 to the Taylor Group from the escrow account. Plaintiffs also argued that Guidry was subject to jurisdiction because he took part in a conspiracy involving Illinois participants.

Guidry filed a reply in support of his motion arguing that the plaintiffs failed to show that he transacted business in Illinois under the terms of the Illinois long-arm statute. He specifically denied that he was an officer of PHD at the time the "Contract/Loan Agreement" between the company and the Richum Group was entered, denied doing anything to induce the transfer of plaintiffs' money from Illinois

to Texas, and insisted that plaintiffs failed to show that the contract was entered into in Illinois.

On November 30, 2007, the circuit court filed a written order denying Guidry's motion to dismiss. In doing so, the court noted that in order to determine whether personal jurisdiction exists over a particular party, it was required to conduct a two-step analysis pursuant to this court's decision in *International Business Machines Corp. v. Martin Property & Casualty Insurance Agency, Inc.*, 281 Ill. App. 3d 854, 858, 666 N.E.2d 866, 868 (1996). The court stated that the first step of the analysis required it to determine whether the plaintiffs' claims fell within the scope of Illinois's long-arm statute, and it concluded that the plaintiffs adequately alleged that the Guidry defendants committed "a tortious act within this State" as contemplated by subsection 2—209(a)(2) of the statute (735 ILCS 5/2—209(a)(2) (West 2006)) by asserting in the complaint that they breached a fiduciary duty owed to plaintiffs which resulted in the plaintiffs' loss of $390,000 in Illinois. The court then stated that the second step of the analysis required it to determine whether its exercise of jurisdiction over the Guidry defendants would violate their rights to due process and determined that it did not because the Guidry defendants had established "sufficient minimum contacts with the State of Illinois through the role of escrow account manager and acts in connection therewith." The Guidry defendants appeal from this ruling.

On appeal, the Guidry defendants argue that, consistent with principles of due process, the courts of this state may not exercise personal jurisdiction over them because they lack sufficient minimum contacts with Illinois. In support, defendants note that they have never been physically present in the state, conducted activities in the state, directed any activities toward the state, or entered into any continuing relationships with individuals present in the state. The Guidry defendants deny that they had any contacts with the state and insist that Guidry was not a member of PHD and did not negotiate the transfer of plaintiffs' fund from Illinois. They further assert that they cannot be held subject to Illinois jurisdiction, as plaintiffs suggest, under the so-called "conspiracy theory of jurisdiction," which provides that an out-of-state defendant may be subject to personal jurisdiction here if his coconspirators committed an overt act in furtherance of the conspiracy in this state, because the doctrine has been declared unconstitutional in this state.

The Guidry defendants also contest the circuit court's finding that his alleged conduct caused injury in Illinois, thus submitting them to jurisdiction here. They argue that the legal principle underlying this determination, that jurisdiction may lie in the forum where any injury

is felt, was rejected in this court's decision in *Sabados v. Planned Parenthood of Greater Indiana*, 378 Ill. App. 3d 243, 882 N.E.2d 121 (2007). Furthermore, they suggest, any injury suffered by plaintiffs was felt in their native states of Missouri and Florida, not in Illinois where the escrow account was located, because that is where they felt the economic impact of the alleged fraud.

In response, plaintiffs assert that, regardless of the viability of the conspiracy theory, the Guidry defendants had sufficient minimum contacts with Illinois to be haled into court here. They contend that the Guidry defendants subjected themselves to Illinois's jurisdiction by committing tortious acts and also by transacting business in this state, which gives rise to plaintiffs' cause of action. Plaintiffs specifically assert that the Guidry defendants are subject to jurisdiction because Guidry was an officer of PHD, who was responsible for inducing the Richum Group to send plaintiffs' money from Illinois to Texas and who committed an overt tortious act in Illinois by transmitting a portion of money PHD received from the Richum Group back to Taylor, an Illinois resident. Lastly, plaintiffs urge that the Guidry defendants are subject to jurisdiction under the conspiracy theory, which they contend is still viable in this state, because they took part in a conspiracy that involved Illinois actors.

Additionally, in the statement of facts contained in their response brief, plaintiffs assert for the first time on appeal that plaintiff Knaus was a resident of Illinois at the time of the fraud. In support of this claim, they cite to a bank withdrawal slip for $300,000 addressed to "Brian Knaus 813 English Ln Belleville, Il 62223" that was attached to their complaint. At oral argument, counsel for plaintiffs conceded that they never asserted that Knaus was an Illinois resident before the circuit court.

In reply, the Guidry defendants challenge plaintiffs' attempt to assert that Knaus was an Illinois resident for the first time on appeal, observing that the plaintiffs alleged in their complaint simply that Knaus "is a resident of the State of Florida" and never claimed that he was a resident of this state before the circuit court. They also claim that even if Knaus was a resident of Illinois and thus felt injury here, there is no evidence that they knew that he resided here and could not have intended to effect an Illinois interest as is required under due process analysis. The Guidry defendants deny taking part in the negotiations between the Richum Group and PHD and contend that there is no evidence indicating that they did. Even if they did take part in such negotiations, they note, any such conduct did not confer Illinois courts with jurisdiction over them because the contract was entered between foreign parties, the Richum Group, a Wyoming company, and PHD, a Florida company.

## II. ANALYSIS

The sole issue on appeal is whether the circuit court erred in concluding that the courts of this state may exercise jurisdiction over the Guidry defendants, who are residents of Texas. The burden of establishing a basis for personal jurisdiction over nonresident defendants belonged to the plaintiffs. *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 383, 827 N.E.2d 1031, 1033 (2005). In determining whether a particular defendant is subject to the jurisdiction of this state, the court must first determine whether plaintiff has established a *prima facie* case of jurisdiction through the untraversed pleadings, documents, and affidavits. *TCA International, Inc. v. B&B Custom Auto, Inc.*, 299 Ill. App. 3d 522, 531, 701 N.E.2d 105, 112 (1998). Concomitantly, at this juncture the court must also accept as true any facts averred by the defendant which have not been contradicted by an affidavit submitted by plaintiff. *TCA International, Inc.*, 299 Ill. App. 3d at 531, 701 N.E.2d at 112. If jurisdictional facts remain in controversy, then the court must conduct a hearing to resolve those disputes. *TCA International, Inc.*, 299 Ill. App. 3d at 531, 701 N.E.2d at 112. Where, as here, the court decides the matter on documentary evidence alone, this court's review of that decision is *de novo*. *TCA International, Inc.*, 299 Ill. App. 3d at 531, 701 N.E.2d at 112.

The ability of the courts of our state to exercise jurisdiction over nonresidents is governed by the Illinois long-arm statute, which provides, in part, that "[a]ny person, whether or not a citizen or resident of this state, who in person or through an agent" submits to personal jurisdiction in Illinois if he takes part in the "transaction of any business" or "commission of a tortious act" within this state. 735 ILCS 5/2—209(a)(1), (a)(2) (West 2006). The statute further provides that a court may "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2—209(c) (West 2006).

In reaching its decision that the Guidry defendants were subject to personal jurisdiction in this case, the circuit court applied the analytical framework utilized by this court in *International Business Machines Corp. v. Martin Property & Casualty Insurance Agency, Inc.*, 281 Ill. App. 3d 854, 858, 666 N.E.2d 866, 868 (1996). In that case, we held that in order to determine whether the exercise of jurisdiction over a particular defendant was proper the court was required to engage in a two-step analysis—determining first whether jurisdiction was proper under the specific language of the long-arm statute and then proceeding to determine whether the exercise of jurisdiction comported with principles of due process. *International Business Machines Corp.*, 281 Ill. App. 3d at 858, 666 N.E.2d at 868.

In our more recent decision in *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 803 N.E.2d 1031 (2005), however, we held that the two-step analysis of *International Business Machines Corp.* was rendered outmoded by the addition of subsection 2—209(c) of the long-arm statute (735 ILCS 5/2—209(c) (West 2004)), which allows the courts of our state to exercise personal jurisdiction over individuals on any basis permitted by the Illinois Constitution and the Constitution of the United States. *Kostal*, 357 Ill. App. 3d at 386, 803 N.E.2d at 1036. Because the long-arm statute permits the exercise of jurisdiction in any circumstance where due process requirements are met, we concluded that the two steps for determining jurisdiction collapsed into one. *Kostal*, 357 Ill. App. 3d at 386-87, 803 N.E.2d at 1036. Thus, we held "if the contacts between a defendant and Illinois are sufficient to satisfy both federal and state due process concerns, the requirements of Illinois' long-arm statute have been met, and no other inquiry is necessary." *Kostal*, 357 Ill. App. 3d at 387, 803 N.E.2d at 1036. We concluded, however, that the old two-step inquiry was replaced by a new two-step analysis. *Kostal*, 357 Ill. App. 3d at 387, 803 N.E.2d at 1036. In doing so, we noted that the supreme court has indicated that the due process protections arising from the United States and Illinois Constitutions are not identical and must be analyzed separately. *Kostal*, 357 Ill. App. 3d at 386-87, 803 N.E.2d at 1036, citing *Rollins v. Ellwood*, 141 Ill. 2d 244, 565 N.E.2d 1302 (1990); *People v. Lindsey*, 199 Ill. 2d 460, 771 N.E.2d 399 (2002).

Under the due process clause of the United States Constitution, jurisdiction over a particular out-of-state defendant may be based upon "general" or "specific" jurisdiction. *Borden Chemicals & Plastics, L.P. v. Zehnder*, 312 Ill. App. 3d 35, 41, 726 N.E.2d 73, 78-79 (2000). As articulated in *Zehnder*, "[w]hile 'general jurisdiction,' for personal jurisdiction purposes, applies to suits neither arising out of nor related to a nonresident defendant's contacts with the forum, and is permitted only where the defendant has continuous and systematic general business contacts with the forum, 'specific jurisdiction' refers to personal jurisdiction in a suit arising out of or related to a defendant's contacts with the forum." *Zehnder*, 312 Ill. App. 3d at 41, 726 N.E.2d at 78-79. In this case, plaintiffs appear to concede that the Guidry defendants have not had continuous and systematic contact with Illinois so as to subject them to general personal jurisdiction. Consequently, we must determine whether the Guidry defendants are subject to specific personal jurisdiction.

■ In order to subject a particular defendant to specific personal jurisdiction in a given forum, he must "have certain minimum contacts with it such that the maintenance of the suit does not offend

'traditional notions of fair play and substantial justice.' [Citation.]" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945). Such a defendant may be subject to jurisdiction only if his conduct and connection with the forum State with respect to the subject matter of the lawsuit are such that "he should reasonably have anticipated being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 501, 100 S. Ct. 559, 567 (1980). This requirement ensures the " 'orderly administration of the laws' [citation]," and "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to whether that conduct will and will not render them liable to suit." *Woodson*, 444 U.S. at 297, 62 L. Ed. 2d at 501, 100 S. Ct. at 567.

Under the due process guidelines of the Illinois Constitution, a court may exercise jurisdiction "only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 141 Ill. 2d 244, 275, 565 N.E.2d 1302, 1316 (1990).

■ Before proceeding to analyze whether the exercise of the jurisdiction over the Guidry defendants offends due process considerations, we must preliminarily address two matters. First, we must determine the residency of plaintiff Knaus for purposes of this appeal. Although plaintiffs admit that they never argued before the circuit court that Knaus lived in Illinois at the time when the defendants allegedly defrauded him, plaintiffs nevertheless contend that Knaus should be considered to be a resident of Illinois for purposes of this appeal. We disagree. We note that plaintiffs never before the circuit court attempted to argue or submit that Knaus was a resident of Illinois and, indeed, alleged in their complaint that he was a resident of Florida. Thus, they may not now raise the point for the first time on appeal. *Mortgage Electronic Registration Systems, Inc. v. Thompson*, 368 Ill. App. 3d 1035, 1039, 859 N.E.2d 621, 625-26 (2006). The bank slip addressed to "Brian Knaus 813 English Ln Belleville, Il 62223," which plaintiffs now for the first time on appeal cite as proof of Knaus's Illinois residence, was attached to the complaint, not to establish his residence, but for the wholly separate purpose of establishing that Knaus transferred $300,000 to the Richum defendants pursuant to the contract between the parties. Plaintiffs bore the burden of establishing that the Guidry defendants were subject to personal jurisdiction in this state (*Kostal*, 357 Ill. App. 3d at 383) and their attorneys certainly had the opportunity to establish that Knaus lived in Illinois at the time of the fraud, but failed to do so. Plaintiffs

cannot now, for the first time on appeal, argue that Knaus was a resident of Illinois.

The second matter that must be considered before proceeding with our analysis is the sufficiency of the affidavits submitted by the Guidry defendants in support of their motion to dismiss. On appeal, the Guidry defendants contend that the circuit court's decision must be reversed because their affidavits rebutted every basis for personal jurisdiction advanced by the plaintiffs. *TCA International, Inc.*, 299 Ill. App. 3d at 531 (in deciding issues of personal jurisdiction, court must accept as true any facts averred by defendant which have not been contradicted by an affidavit submitted by plaintiff). The Guidry defendants submitted a total of three affidavits in their attempts to secure dismissal of the claims against them. The first affidavit, dated January 15, 2007, was attached to both the Guidry defendants' original, superceded motion to dismiss as well as the plaintiffs' response to the motion to dismiss. In that affidavit, Guidry averred, in part, that his law firm had no contacts with Illinois, that it did not enter into any contractual relationships with plaintiffs, and that the firm was retained to represent PHD. Guidry also asserted that he "was not a director, officer, employee, agent or shareholder of PHD" and did not have any management control over the company, and that "[t]he relationship between Charles C. Guidry, PC and PHD *** was limited to a retained attorney-client relationship." He further claimed that neither he nor his firm participated in the drafting of the "Contract/Loan Agreement" entered between the Richum Group and PHD and that the "limited role" of his firm was to act "as the vehicle for receiving the money and upon the receipt of the money" from the Richum Group to transfer the money to Carter pursuant to his instructions.

Guidry's second and third affidavits, both dated September 25, 2007, were attached to the Guidry defendants' amended motion to dismiss. Guidry submitted one of these documents on behalf of his law firm and the other on his own behalf. In the affidavits, he averred that neither he nor his firm had a "connection to the Richum Group" or was "involved in or connected to" the transactions between the Richum Group and plaintiffs, whereby plaintiffs remitted the $390,000 to the Illinois escrow account. Guidry proceeded in the affidavits by denying that he or his firm committed any of the specific bases for jurisdiction articulated in the Illinois long-arm statute, specifically averring that neither he nor his firm had: transacted any business in Illinois, committed a tortious act here; owned, used, or possessed real estate in this state; contracted to insure a risk in Illinois; maintained a matrimonial domicile, had sexual intercourse, had a spouse or child

in Illinois; performed any contract or promise substantially connected with the state; owned, possessed, or controlled anything of value in Illinois; owed a fiduciary duty to an Illinois resident; performed duties as a director or officer of a corporation organized in or having its principle place of business in this state; owned an interest in a trust administered in Illinois; or been physically in Illinois.

■ Plaintiffs assert that Guidry's averments that neither he nor his firm "transacted any business" or "committed a tortious act" in Illinois should not be considered for purposes of determining jurisdiction because they are conclusory denials of the specific bases of jurisdiction asserted by plaintiffs in this case pursuant to subsections 2—209 (a)(1) and (a)(2) of the long-arm statute (735 ILCS 5/2—209(a)(1), (a)(2) (West 2006) (stating that out-of-state defendant may be subject to Illinois jurisdiction if he participates in the "transaction of any business within this State" or the "commission of a tortious act within this State")). We agree. Under Supreme Court Rule 191(a) (210 Ill. 2d R. 191(a)), affidavits attached to a motion to dismiss for lack of personal jurisdiction "shall set forth with particularity the facts upon which the *** defense is based" and "shall not consist of conclusions but of facts admissible in evidence." Because these averments constitute legal conclusions, they will not be considered. *LaSalle National Bank v. City of Highland Park*, 344 Ill. App. 3d 259, 277, 799 N.E.2d 781, 796 (2003). With regard to Guidry's other averments, including his claims that neither he nor his firm had any connection with the Richum Group, that they were not connected to the contracts between the Richum Group and plaintiffs, that he was not an officer or manager of PHD, and that his firm's only relationship with PHD was that of its retained legal counsel, we conclude that they may be considered in determining jurisdiction over the Guidry defendants.

Having determined which portions of the affidavits submitted by the Guidry defendants may be considered, we must now analyze whether, in light of those averments, plaintiffs have shown a basis for jurisdiction over the Guidry defendants through the uncontroverted portions of their pleadings and evidentiary submissions. Plaintiffs claim that they have shown three bases for the exercise of jurisdiction over the Guidry defendants. First, the plaintiffs assert that they have established that Guidry was a manager of PHD and that he negotiated the transfer of the plaintiffs' funds from Illinois to Texas, thus committing a tortious act in this state and transacting business here. Second, plaintiffs contend that Guidry committed a tortious act in Illinois by distributing a portion of the misappropriated funds back to Taylor in Illinois. Third, they argue that the Guidry defendants are subject to jurisdiction because they committed overt acts in support of

a conspiracy in Illinois. We shall address each of these contentions in turn.

Plaintiffs first claim that they have shown that, contrary to Guidry's affidavits in which he averred that the relationship between him and PHD consisted of nothing more than an attorney-client relationship, Guidry was in fact an officer and manager of PHD. In support, plaintiffs submitted and cite to various documents Guidry submitted to the Florida Secretary of State purporting to amend the articles of organization for PHD to reflect the fact that he held positions in the company as treasurer, secretary, and manager of the company as of the date of the contract between the Richum Group and PHD. Thus, the question as to Guidry's relationship with PHD remains in dispute.

Even if the circuit court were to ultimately conclude that Guidry was a manager of PHD, however, this fact alone would be insufficient to show that he negotiated the contract between PHD and the Richum Group. In one of his affidavits, Guidry averred that neither he nor his firm participated in the drafting of the agreement between the companies. Indeed, we note that although the plaintiffs' complaint contains a single, vague and unexplained allegation that Guidry was one of numerous individuals who "induced" the Richum Group to transfer the money, they do not allege that Guidry negotiated the transfer but instead contend that "Erickson, on behalf of the Richum Group and with the consent and knowledge of Anderson *** entered into a 'Contract/Loan Agreement' with Defendant Jerome Carter of PHD Management Group, LLC and Defendant Taylor." Furthermore, the Contract/Loan Agreement between the Richum Group and PHD was executed only by Erickson and Carter. Although Guidry signed the collateral Escrow Account Agreement, which specified how the Richum Group would deliver the funds to PHD pursuant to the Contract/Loan Agreement, this fact alone does not raise the inference that Guidry negotiated the transfer.

Furthermore, even assuming *arguendo* that Guidry negotiated the contract as a manager of PHD, the record does not indicate that he negotiated with anyone other than Erickson, the Richum Group's vice-president, who was a resident of Missouri. Although plaintiffs assert on appeal that he negotiated with Illinois resident Wesley Taylor, citing a letter Guidry wrote to an investigator of the State Bar of Texas in which he stated that "Taylor was the only speaking agent for the Richum Group," this assertion is contradicted by the plaintiffs themselves in their other pleadings. In their complaint, plaintiffs do not allege that Taylor was an agent of the Richum Group, but rather allege that he was the principal of another entity, the Taylor Group

Corporation, that he was a party to the Contract/Loan Agreement with the Richum Group, and that Taylor participated in inducing the Richum Group to send the Illinois escrow funds to Guidry's Texas account. Thus, even if Guidry were found to be a manager of PHD, plaintiffs have not shown that he negotiated the transfer of plaintiffs' funds from Illinois and thereby committed a tortious act in this state or transacted business here.

Plaintiffs next contend that the Guidry defendants committed tortious activity in Illinois by distributing $12,000 of the $350,000 PHD received from the Richum Group back to defendant Taylor in Illinois. In support of this claim, plaintiffs attached a letter Guidry wrote to an investigator with the State Bar of Texas in which he admitted that he sent $12,000 to Taylor. We observe that plaintiffs have not provided authority to demonstrate that this conduct, in the absence of any other connection to the fraud perpetrated against plaintiffs, would suffice to subject the Guidry defendants to Illinois's jurisdiction. In point of fact, there is authority by analogy that in breach of contract litigation, the mere transmission of funds into a state does not suffice as a sufficient contract to subject the sender its jurisdiction. See *Northern Trust Co. v. Randolph C. Dillon, Inc.*, 558 F. Supp. 1118, 1123 (N.D. Ill. 1983) (when contract for purchase of computer equipment was between foreign residents, sending of payments to third party in Illinois did "not suffice to confer personal jurisdiction over a nonresident defendant" in breach of contract action); *U-Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 763 (Tex. 1977) (where contract between Oklahoma resident and Texas company was solicited, negotiated, consummated, and performed in Oklahoma, mere sending of payments by defendant to Texas was insufficient minimum contact to subject him to jurisdiction in Texas in breach of contract action).

Even if we assume *arguendo* that the Guidry defendants took part in the conspiracy to defraud the plaintiffs, this participation would not be sufficient to subject them to personal jurisdiction. Plaintiffs argue, relying upon the so-called "conspiracy theory of jurisdiction," that because one or more members of the conspiracy resided in Illinois, their contacts with this state can be attributed to the Guidry defendants, subjecting them to personal jurisdiction here.

We note, however, that our supreme court has indicated a hesitancy to approve the conspiracy theory of jurisdiction (*Green v. Advance Ross Electronics Corp.*, 86 Ill. 2d 431, 440-41, 427 N.E.2d 1203, 1208 (1981)), and there is a conflict among the districts of this court as to whether the theory applies (*Cleary v. Philip Morris, Inc.*, 312 Ill. App. 3d 406, 726 N.E.2d 770 (2000); *Ploense v. Electrolux Home Products, Inc.*, 377 Ill. App. 3d 1091, 882 N.E.2d 653 (2007)). In

*Green*, the supreme court examined the doctrine and noted that its viability was questioned by the federal District Court for the Northern District of Illinois and found it inapplicable under the facts of that case. *Green*, 86 Ill. 2d at 440-41, 427 N.E.2d at 1208. *Green* involved a suit for wrongful termination of employment. *Green*, 86 Ill. 2d at 434, 427 N.E.2d at 1205. One of the defendants, Advance Ross Corporation, which was headquartered in Illinois, brought a counterclaim against the plaintiff and his father alleging that the father conspired with his son to misappropriate funds of one of its Texas subsidiaries. *Green*, 86 Ill. 2d at 434, 427 N.E.2d at 1205. Advance Ross argued that because the plaintiff was subject to Illinois jurisdiction, his father was subject to jurisdiction as well under the long-arm statute. *Green*, 86 Ill. 2d at 440, 427 N.E.2d at 1208. The court disagreed, noting that the plaintiff was subject to Illinois jurisdiction because he chose to file suit in the state, not because his actions fell within the scope of the long-arm statute. *Green*, 86 Ill. 2d at 440, 427 N.E.2d at 1208. Consequently, the court concluded, the fact that the plaintiff was subject to Illinois jurisdiction did not "indicate that any of the tortious acts he is charged with performing in concert with his father satisfy the requirement of the long-arm statute." *Green*, 86 Ill. 2d at 440, 427 N.E.2d at 1208. The court continued:

"It is not true that if one conspirator is subject to Illinois jurisdiction so are all the others. Rather, the theory of jurisdiction based on the acts of a co-conspirator must be that co-conspirators are each others' agents; thus the argument would be that when a conspirator commits a tortious act within Illinois he does so as agent for his co-conspirators, who thereby also become subject to this State's jurisdiction." *Green*, 86 Ill. 2d at 440-41, 427 N.E.2d at 1208.

The court then noted that the "idea of jurisdiction based on the acts of co-conspirators has been questioned," and concluded that even if the doctrine could be applied in some cases, it was not applicable in that case because the plaintiff committed no tortious acts within Illinois. *Green*, 86 Ill. 2d at 441, 427 N.E.2d at 1208, citing *Chromium Industries, Inc. v. Mirror Polishing & Plating Co.*, 448 F. Supp. 544, 552 (N.D. Ill. 1978).

After *Green*, the districts of this court split on the viability of the doctrine. See *Cleary v. Philip Morris, Inc.*, 312 Ill. App. 3d 406, 726 N.E.2d 770 (2000); *Ploense v. Electrolux Home Products, Inc.*, 377 Ill. App. 3d 1091, 882 N.E.2d 653 (2007). In a recent decision, the Fourth District rejected the conspiracy theory of jurisdiction as inconsistent with principles of due process. *Ploense v. Electrolux Home Products, Inc.*, 377 Ill. App. 3d 1091, 882 N.E.2d 653 (2007). In that case, the

plaintiffs filed a wrongful death action against various producers of chrome products and the Chrome Coalition, a trade organization formed to promote the "sale and use of products containing chrome," alleging that their conduct contributed to her husband's development of terminal lung cancer due to exposure to chrome at work. *Ploense*, 377 Ill. App. 3d at 1092-93, 882 N.E.2d at 656. She alleged that the Chrome Coalition and the chrome producers engaged in a conspiracy to suppress information regarding the harmful effects of chrome. *Ploense*, 377 Ill. App. 3d at 1093, 882 N.E.2d at 656-57. The Chrome Coalition filed a motion to dismiss the action for lack of personal jurisdiction on grounds that it had no contacts with the state of Illinois, which was denied by the circuit court. *Ploense*, 377 Ill. App. 3d at 1094, 882 N.E.2d at 657-58.

On appeal, the court reversed, rejecting the application of the conspiracy theory. In doing so, the court cited the supreme court's observation in *Green* that the conspiracy doctrine is premised on the character of coconspirators as agents and that the supreme court rejected this in *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 24, 694 N.E.2d 565, 571 (1998), by holding that no agency relationship could exist between coconspirators. *Ploense*, 377 Ill. App. 3d at 1105, 882 N.E.2d at 666.

The *Ploense* court then observed that the supreme court's reservations about the theory were reflected by its citation in *Green* to *Chromium Industries, Inc. v. Mirror Polishing & Plating Co.*, 448 F. Supp. 544, 552 (N.D. Ill. 1978). *Ploense*, 377 Ill. App. 3d at 1105-06, 882 N.E.2d at 666. In *Chromium Industries*, the plaintiff argued that the court could exercise jurisdiction over out-of-state defendants because they were part of a conspiracy and that one of their coconspirators committed an overt act causing tortious injury in Illinois. *Chromium Industries*, 448 F. Supp. at 552. The court found that the defendants had not transacted business in the state and observed that if the theory were applied to subject them to personal jurisdiction in Illinois based upon the conduct of others, the result would be the forum's exercise of jurisdiction over them even though they had no individual contacts with the forum. *Chromium Industries*, 448 F. Supp. at 552.

The *Ploense* court concluded that based on the reservations reflected by *Green* regarding conspiracy theory of jurisdiction, which was based upon a constructive agency relationship between coconspirators and the ultimate rejection of such an agency relationship in *Buckner*, it would not be inconsistent with the reasoning of our supreme court to reject the conspiracy theory as a sufficient basis upon which jurisdiction can be premised. *Ploense*, 377 Ill. App. 3d at 1105-06, 882

N.E.2d at 666. Accordingly, *Ploense* concluded that the Chrome Coalition had insufficient individual contacts with Illinois in that it never purposefully availed itself of the benefits and protections of Illinois laws, that plaintiffs never alleged that it targeted residents of this state with its misinformation, and that there was no evidence that the association had any agreements with chrome producers regarding Illinois. *Ploense*, 377 Ill. App. 3d at 1106-07, 882 N.E.2d at 667-68.

This district considered the viability of the conspiracy theory of jurisdiction in *Cleary v. Philip Morris, Inc.*, 312 Ill. App. 3d at 408, 726 N.E.2d at 772. *Cleary* involved a class action lawsuit filed by Illinois tobacco smokers against multiple tobacco companies, including Brown & Williamson Tobacco Corporation and British-American Tobacco. Plaintiffs also sued the parent corporation of the two companies, B.A.T. Industries, which was based in London, England. *Cleary*, 312 Ill. App. 3d at 408, 726 N.E.2d at 772. Although B.A.T. was a shareholder in the companies, it did not exert any control over their day-to-day operations. *Cleary*, 312 Ill. App. 3d at 408, 726 N.E.2d at 772. B.A.T. Industries filed a motion to dismiss for lack of personal jurisdiction and averred in an attached affidavit that it "never engaged in the manufacture, sale, advertising or marketing of tobacco products" in Illinois and had no other contact with the state. *Cleary*, 312 Ill. App. 3d at 408, 726 N.E.2d at 772. Plaintiffs acknowledged these facts, but nevertheless argued that B.A.T. was subject to Illinois jurisdiction because it had entered into a conspiracy with other companies to "conceal the addictive nature of nicotine" from Illinois residents and in furtherance of this conspiracy accepted the transfer of "certain research and development reports compiled in the United States on the topic of smoking, disease and addiction" from its subsidiary, Brown & Williams, in an effort "to remove sensitive and inculpatory documents from the United States." *Cleary*, 312 Ill. App. 3d at 408-09, 726 N.E.2d at 772-73.

We rejected this argument that B.A.T. could be subject to jurisdiction in Illinois because of its participation in a conspiracy because the unrebutted affidavits it submitted in support of its motion to dismiss showed that it did not commit any act designed to further a conspiracy in Illinois. *Cleary*, 312 Ill. App. 3d at 412, 726 N.E.2d at 775. In *dicta*, we noted the supreme court's "hesitancy" in applying the conspiracy theory of jurisdiction in *Green*, but nevertheless stated:

> "[T]he rationale underlying the due process requirement of 'minimum contacts' is that the defendant must be able to foresee the possibility of being haled into a forum court given its conduct and connection with the forum state. *Burger King Corp. v. Rudze-*

*wicz,* 471 U.S. 462, 474, 85 L. Ed. 2d 528, 542, 105 S. Ct. 2174, 2183 (1985). To reject the conspiracy in all cases has the effect of giving those outside Illinois who have perpetrated an Illinois tort through the agency of others a potentially unfair immunity from suit. Surely those that join a conspiracy the purpose of which is to commit fraud or other tort in Illinois should, in some circumstances, reasonably foresee the possibility of being haled into court here. We therefore hold that in circumstances where the defendant has actively supported a conspiracy where one of its members operated in Illinois, there may exist the 'minimum contacts' necessary to fairly assert jurisdiction.

We reject the argument that the conspiracy theory somehow undermines the individualized analysis required by due process. Defendants who are subjected to conspiracy-based long-arm jurisdiction in Illinois must necessarily be provided the same due process protections as any other out-of-state defendant." *Cleary,* 312 Ill. App. 3d at 410, 726 N.E.2d at 773-74.

Turning to authorities outside our state, we likewise observe that there is a split among the jurisdictions regarding the constitutionality of the conspiracy theory of jurisdiction. Many courts and commentators have criticized the doctrine as an imprecise and sometimes inaccurate test for determining jurisdiction. *Silver Valley Partners, LLC v. De Motte,* 400 F. Supp. 2d 1262, 1268 (W.D. Wash. 2005); *Youming Jin v. Ministry of State Security,* 335 F. Supp. 2d 72, 80 (D.D.C. 2004); *In re New Motor Vehicles Canadian Export Antitrust Litigation,* 307 F. Supp. 2d 145, 157-58 (D. Me. 2004); *Steinke v. Safeco Insurance Co. of America,* 270 F. Supp. 2d 1196, 1200 (D. Mont. 2003); *Insolia v. Philip Morris Inc.,* 31 F. Supp. 2d 660, 672 (W.D. Wis. 1998); *Chromium Industries, Inc. v. Mirror Polishing & Plating,* 448 F. Supp. 544, 552 (N.D. Ill. 1978); *Kipperman v. McCone,* 422 F. Supp. 860, 873 n.14 (N.D. Cal. 1976); *Kaiser Aetna v. Deal,* 86 Cal. App. 3d 896, 901, 150 Cal. Rptr. 616, 619 (1978); *National Industrial Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex. 1995); *Hewitt v. Hewitt,* 78 Wash. App. 447, 455, 896 P.2d 1312, 1316 (1995); S. Riback, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction,* 84 Colum. L. Rev. 506, 510 (1984) (hereinafter Riback); A. Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis,* 52 Fordham L. Rev. 234, 252-53 (1983) (hereinafter Althouse). In so critiquing the theory, these authorities insist that it departs from a fundamental principle underlying personal jurisdiction, that each defendant's contacts with a forum must be analyzed individually, by basing jurisdiction over a defendant, not based upon his contacts with the forum, but upon the contacts of others. *De Motte,* 400 F. Supp. 2d at 1268; *Youming Jin,* 335 F. Supp. 2d

at 80; *Chromium Industries, Inc.*, 448 F. Supp. at 552; *Kipperman*, 422 F. Supp. at 873 n.14; *Gibson*, 897 S.W.2d at 774; *Deal*, 86 Cal. App. 3d at 901, 150 Cal. Rptr. at 619; *Hewitt*, 78 Wash. App. at 455, 896 P.2d at 1316; Riback, 84 Colum. L. Rev. at 510; Althouse, 52 Fordham L. Rev. at 252-53. As the commentators on the subject have observed, this primary objection to the theory stems from the fact that it is based upon the imprecise legal fiction that all coconspirators are agents of one another and therefore the actions of each member of the conspiracy can be attributed to any other member. Riback, 84 Colum. L. Rev. at 510; Althouse, 52 Fordham L. Rev. at 252-53. The commentators note that in a classic agent-principal relationship, where the contacts of an agent with a given forum are done with the authority of the principal, it makes sense to attribute those contacts to the principal for jurisdictional purposes. Riback, 84 Colum. L. Rev. at 524. For example, in *International Shoe*, the Supreme Court held that a Missouri corporation was subject to *in personam* jurisdiction in Washington state based on the fact that it employed agents in the state to make sales there. *International Shoe Co. v. Washington*, 326 U.S. 310, 316-17, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158-59 (1945). In effect, the presence of the agents were attributed to the principal-corporation for purposes of deciding jurisdiction. *International Shoe*, 326 U.S. at 316-17, 90 L. Ed. at 102, 66 S. Ct. at 158-59.

In the context of conspiracy, by contrast, the "agency" between coconspirators is "more fictional than real." Riback, 84 Colum. L. Rev. at 524. "Since agreement to only a general plan is sufficient for liability, and since a defendant may be liable without knowing all the details of or all the participants in the scheme, the agency created by a conspiracy cannot be thought of in the same way as an ordinary agency." Riback, 84 Colum. L. Rev. at 524. Thus, unlike in a classic agent-principal relationship, a coconspirator may be held liable for the actions of another coconspirator over whom he had no control or knowledge. Riback, 84 Colum. L. Rev. at 524. If the conspiracy theory of jurisdiction were applied in that situation, the result would be the exercise of jurisdiction over an individual who had neither personal contacts with the forum nor knowledge that the conspiracy of which he was a part would operate there. Riback, 84 Colum. L. Rev. at 524. Under these circumstances, the commentators argue, the application of the conspiracy theory of jurisdiction would be unconstitutional because the coconspirator did nothing to avail himself of jurisdiction in the forum. Riback, 84 Colum. L. Rev. at 524; Althouse, 52 Fordham L. Rev. at 252-53.

As in *Ploense*, based upon the articulated hesitancy of our supreme court in *Green* to adopt the conspiracy theory of jurisdiction in Illinois,

which is amplified by the foregoing authorities among other jurisdictions and commentators, we feel likewise constrained from doing so. Moreover, while the courts of other jurisdictions have recognized the conspiracy theory of jurisdiction as a basis of jurisdiction (*Textor v. Board of Regents of Northern Illinois University*, 711 F.2d 1387, 1392 (7th Cir. 1983); *Remmes v. International Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1095 (N.D. Iowa 2005); *Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000); *In re North Dakota Personal Injury Asbestos Litigation No. 1*, 737 F. Supp. 1087, 1098 (D.N.D. 1990); *Gemini Enterprises, Inc. v. WFMY Television Corp.*, 470 F. Supp. 559, 564 (M.D.N.C. 1979); *Istituto Bancario Italiano SpA v. Hunter Engineering Co.*, 449 A.2d 210, 225 (Del. 1982); *Mackey v. Compass Marketing, Inc.*, 391 Md. 117, 130-31, 892 A.2d 479, 488-89 (2006); *Hunt v. Nevada State Bank*, 285 Minn. 77, 112, 172 N.W.2d 292, 312 (1969); *Chenault v. Walker*, 36 S.W.3d 45, 54 (Tenn. 2001)), these courts nevertheless require a showing that conspirators conspired to do something that they could reasonably expect to lead to consequences in the forum (*Remmes*, 389 F. Supp. 2d at 1095 (accepting conspiracy theory of jurisdiction, in part, because consistent with Iowa long-arm statute that permits the exercise of jurisdiction over out-of-state plaintiff when his actions cause injury in state); *Simon*, 86 F. Supp. 2d at 120 (conspiracy theory of jurisdiction requires showing that coconspirator "had an awareness of the effects in New York of its activity"); *Rudo v. Stubbs*, 221 Ga. App. 702, 704, 472 S.E.2d 515, 517 (1996) (accepting conspiracy theory of jurisdiction in Georgia in circumstances where "alleged conspiracy is targeted at one or more Georgia residents specifically"); *Mackey*, 391 Md. at 133-34, 892 A.2d at 488-89 (approving use of conspiracy theory of jurisdiction upon showing that conspirators intended to do something they could reasonably expect to lead to "consequences" in forum); *Hunt*, 285 Minn. at 112-13, 172 N.W.2d at 312-13 (accepting conspiracy theory of jurisdiction when out-of-state defendant takes part in conspiracy, "the inescapable effect of which is to injure Minnesotans"); *Chenault*, 36 S.W.3d at 53 (approving use of conspiracy theory of jurisdiction upon showing that conspirators intended to do something they could reasonably expect to lead to "consequences" in forum); but see *Istituto Bancario Italiano SpA*, 449 A.2d at 225 (holding conspiracy theory applicable if "defendant knew or had reason to know of the act [in furtherance of conspiracy] in the forum state or that acts outside the forum state would have an effect in the forum state"). Those that have not explicitly required an effect in the forum involved plaintiffs who suffered injury in the forum. *Textor*, 711 F.2d at 1389; *In re North Dakota Personal Injury Asbestos Litigation No. 1*, 737 F. Supp. at 1098; *Gemini Enterprises, Inc.*, 470 F. Supp. at 565).

While there do not appear to be any United States Supreme Court decisions dealing with the conspiracy theory of jurisdiction, under which an out-of-state coconspirator can be subjected to *in personam* jurisdiction predicated upon the vicarious acts of a coconspirator, it is nevertheless clear that, in any event, conduct sufficient to subject a foreign defendant to jurisdiction of a particular forum must involve, at the very least, an act purposefully directed at the forum state, such as conduct designed to create an injury in that state. *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 112, 94 L. Ed. 2d 92, 104, 107 S. Ct. 1026, 1032 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 541, 105 S. Ct. 2174, 2182 (1985); *Calder v. Jones*, 465 U.S. 783, 788-89, 79 L. Ed. 2d 804, 812-13, 104 S. Ct. 1482, 1486-87 (1984); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 79 L. Ed. 2d 790, 797, 104 S. Ct. 1473, 1478 (1984). In *Burger King Corp. v. Rudzewicz*, the Court noted that due process requires out-of-state defendants to have " 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign' " before they may be subject to jurisdiction there. *Rudzewicz*, 471 U.S. at 472, 85 L. Ed. 2d at 540, 105 S. Ct. at 2182, quoting *Shaffer v. Heitner*, 433 U.S. 186, 218, 53 L. Ed. 2d 683, 706, 97 S. Ct. 2569, 2587 (1977) (Stevens, J., concurring in judgment). The Court then held that "[w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, [citation], and the litigation results from alleged injuries that 'arise out of or relate to' those activities. [Citation.]" *Rudzewicz*, 471 U.S. at 473, 85 L. Ed. 2d at 540-41, 105 S. Ct. at 2182. Indeed, the Court has repeatedly found the exercise of jurisdiction over an out-of-state defendant proper when his conduct is directed toward the resident of the forum. *Calder*, 465 U.S. at 788-89, 79 L. Ed. 2d at 812-13, 104 S. Ct. at 1486-87 (Florida publisher subject to personal jurisdiction in California in libel action because "effects" of tort felt by plaintiff in California where she lived and worked and because defendant's actions "expressly aimed at California"); *Keeton*, 465 U.S. at 774, 79 L. Ed. 2d at 797, 104 S. Ct. at 1478 (in libel action, Ohio publisher subject to jurisdiction in New Hampshire because its actions purposely directed toward state by circulating magazines there); *Asahi Metal Industry Co.*, 480 U.S. at 112, 94 L. Ed. 2d at 104, 107 S. Ct. at 1032 ("The 'substantial connection,' [citations], between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of defendant purposefully directed toward the forum State*" (emphasis in original)).

In the case at bar, plaintiffs have not shown that the defendants purposefully directed their conduct toward Illinois so as to cause an effect in this state. As alleged in plaintiffs' complaint, the purpose of the defendants' conspiracy was to secure the money of plaintiffs, who were residents of Florida and Missouri, through fraud. The plaintiffs suffered any injury from the conspiracy in their native states, not Illinois. See *Cantor Fitzgerald, Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (under choice-of-law principles, where " 'injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.' [Citation.]"); *Freeman v. Laventhol & Horwath*, 34 F.3d 333, 341 (6th Cir. 1994) (for purposes of determining which state's statute of limitations is applicable, when plaintiffs resided in states other than Kentucky and felt the economic impact of tort in their respective states of residence, "those states represent the place where the economic injury was suffered"). Guidry's actions in furtherance of the conspiracy, including his transfer of $12,000 of the $390,000 allegedly stolen from plaintiffs to Taylor in Illinois, were not purposely directed toward Illinois. Thus, the activities of the Guidry defendants do not meet the test as articulated in *Rudzewicz* so as to subject them to the *in personam* jurisdiction of this state, even if the conspiracy theory of jurisdiction were otherwise to apply.

Reversed.

O'MALLEY, P.J., and McBRIDE, J., concur.